**Opinion issued April 2, 2015**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-14-00250-CR

————————————

**AZAN MUHAMMAD JANNAH, Appellant**

**V.**

**THE STATE OF TEXAS**

---

**On Appeal from the County Criminal Court at Law No. 1**
**Harris County, Texas**
**Trial Court Case No. 1883398**

---

## MEMORANDUM OPINION

Appellant Azan Muhammad Jannah was charged by information with the misdemeanor offense of driving while intoxicated ("DWI"). The jury found Jannah guilty and the trial court sentenced him to 180 days' confinement in county jail, probated for one year, and a $750 fine. In two points of error, Jannah

contends that the trial court erred in admitting (1) his blood test result and (2) the search warrant authorizing his blood draw. We affirm.

## Background

Around 2:50 a.m. on March 10, 2013, Officer S. Arellano of the Houston Police Department observed Jannah run two stop signs. Arellano pulled Jannah's car over and testified that when Jannah rolled down the window, he mumbled something about a girlfriend and a cell phone and was "fidgeting." Arellano testified that because Jannah's eyes were glassy and she smelled alcohol on his breath, she called for a DWI unit to come to the scene.

Officer A. Beaudion of the Houston Police Department's DWI Task Force arrived at the scene around 3:20 a.m. Beaudion testified that she noticed several signs that Jannah was intoxicated. She detected a strong odor of alcohol on his breath and noticed that his eyes were red and glassy. She administered a horizontal gaze nystagmus ("HGN") test and determined that Jannah's performance indicated that he was intoxicated. After performing the HGN test, Beaudion transported Jannah to the central intoxilyzer ("central intox") police station to conduct two additional field sobriety tests. Once at the station, Beaudion administered the walk-and-turn and one-leg stand tests, and Jannah's performances on both tests indicated that he was intoxicated.

2

Beaudion requested a breath or blood sample, but Jannah refused. As a result, Beaudion applied for a warrant authorizing a blood draw. A magistrate judge reviewed Beaudion's probable cause affidavit and signed the search warrant at 5:51 a.m.

Jamie Balusek, a registered nurse, worked as a "blood-draw nurse" for the Houston Police Department at the time of Jannah's arrest and drew Jannah's blood. Balusek testified that it is necessary to invert the vials into which blood is placed so that the blood mixes with anticoagulant, preventing the blood from clotting before it is analyzed at the lab. Balusek testified that she inverted the blood vials containing Jannah's blood at least ten times. Officer E. Swift of the Houston Police Department testified that she observed Balusek draw Jannah's blood and invert the blood vials at least ten times.

Laura Mayor, a criminalist at the Houston Police Department Crime Laboratory who worked in the Toxicology Section of the crime lab, analyzed Jannah's blood samples for the presence of alcohol. Before Mayor testified before the jury, Jannah requested a *Kelly* hearing outside the presence of the jury to challenge the reliability of the blood test pursuant to Texas Rule of Evidence 702. Jannah argued that the blood test was unreliable because the State failed to show that the proper technique was used in analyzing Jannah's blood.

Mayor, the sole witness at the *Kelly* hearing, testified that she tested Jannah's blood sample using headspace gas chromatography, an accepted methodology for analyzing blood alcohol content ("BAC") within the relevant scientific community. Mayor testified that she followed proper protocol and that the headspace gas chromatograph instrument was working properly when she analyzed Jannah's blood. She testified that she knew the instrument was working properly because she ran a series of calibrators and controls and they met the required criteria. She also testified that she runs each blood sample twice to ensure that the results are consistent and only deems a result acceptable if the BAC levels of both test results are within five percent of each other. If the variation between the two blood samples is greater than five percent, she retests the sample.

When Mayor analyzed Jannah's blood on May 2, 2013, she ran the sample twice, as required to ensure accuracy. She testified that the difference between the two results was greater than five percent. She therefore retested Jannah's blood on May 15.[1] Mayor also acknowledged that two blood samples drawn from individuals other than Jannah were analyzed on May 2 and also had to be re-analyzed on May 15.

---

[1]     We note that the Forensic Alcohol Analysis Report is dated May 16, 2013 and states that the analysis was completed on May 16, not May 15. But Mayor consistently testified that the second test occurred on May 15 and the parties state the same in their appellate briefs.

On cross-examination during the *Kelly* hearing, Jannah adduced evidence that his blood sample contained clots, the lab made mistakes in other cases, and the pipette used in analyzing his sample failed an external test. Mayor acknowledged that she observed "small clots" in the blood vials and that the evidence form noted that she observed the small clots on May 2. She agreed with Jannah's counsel that clots may prevent a proper analysis because clotted blood usually will not move in the vial. She also acknowledged that failure to invert the blood vials properly may cause clotting. But Mayor testified that she was not concerned that the clots in Jannah's sample affected the accuracy of the analysis because they were small. Jannah's counsel asked Mayor whether she homogenized the blood sample because of the clots, and she acknowledged that she did not.

Additionally, on cross-examination, Mayor testified that analysts use a pipette to pick up samples of blood when testing BAC levels. Mayor testified that one person in the lab is usually responsible for inspecting pipettes. The performance verification form for the pipette used to test Jannah's blood on May 15 contained the words "not in use," which were scratched out. But the form also contained a handwritten notation that the pipette had been in use since December 28, 2012. On June 25, 2013, over a month after Jannah's blood was tested on May 15, the pipette that Mayor used in testing Jannah's blood failed an external test and was taken out of use.

5

The trial court questioned Mayor about the pipette's failure. Mayor explained that there were controls in place on May 15 that would have shown if any equipment was malfunctioning. She testified that "if a pipette was not working properly at that time [of test], then we would see that in our controls as well." Mayor testified that she knew the pipette worked properly on May 15 because the "blood controls were within the specified range."

On cross-examination, Jannah's counsel also offered evidence of a lab audit report dated October 3, 2013. It showed that between September 20 and 27, 2013, two of the lab's six randomly-selected case files contained information that related to a different file. Jannah's counsel argued that this evidence showed that "in general the lab has made mistakes" and therefore there may have been an error in Jannah's case.

The trial court ruled that the May 2 test results were unreliable and that the State could not mention them to the jury, but that the State met its "threshold burden of proof in establishing the reliability of the testing that was done on May 15, 2013."

During trial, Mayor testified before the jury that the May 15 test result was reliable because the two samples' BAC levels were within five percent of each other. When the State offered Mayor's report showing the results of Jannah's BAC, Jannah renewed his objection that the blood test results were unreliable and

6

therefore inadmissible. The trial court overruled his objection and admitted the report. Mayor testified that Jannah's blood was drawn at 6:03 a.m. and his BAC was .117, as indicated in the report. She also testified that Jannah's BAC would have been between .14 and .21 at the time he was stopped.

## Discussion

In two points of error, Jannah contends that the trial court erred in admitting his blood test result and the search warrant for his blood draw.

### A. Standard of Review

We review a trial court's evidentiary rulings for an abuse of discretion. *De La Paz v. State*, 279 S.W.3d 336, 343 (Tex. Crim. App. 2009). We will not reverse a trial court's ruling on evidentiary matters unless the decision was outside the zone of reasonable disagreement. *Winegarner v. State*, 235 S.W.3d 787, 790 (Tex. Crim. App. 2007). If the trial court's ruling can be justified on any theory of law applicable to that ruling, the ruling will not be disturbed. *De La Paz*, 279 S.W.3d at 344 (citing *Sewell v. State*, 629 S.W.2d 42, 45 (Tex. Crim. App. 1982) ("When a trial court's ruling on the admission of evidence is correct, although giving a wrong or insufficient reason, this Court will not reverse if the evidence is admissible for any reason.")).

### 1.     Blood test result

#### (a) Applicable Law

Under Texas Rule of Evidence 702, if a witness possesses scientific, technical, or other specialized knowledge that will assist a fact-finder and is qualified as an expert by knowledge, skill, experience, training, or education, then that expert may offer expert opinion testimony. TEX. R. EVID. 702; *Jensen v. State*, 66 S.W.3d 528, 542 (Tex. App.—Houston [14th Dist.] 2002, pet. ref'd). For expert testimony to be admissible under this rule, the party offering the scientific expert testimony must demonstrate, by clear and convincing evidence, that such testimony "is sufficiently reliable and relevant to help the jury in reaching accurate results." *Tillman v. State*, 354 S.W.3d 425, 435 (Tex. Crim. App. 2011) (quoting *Kelly v. State*, 824 S.W.2d 568, 572 (Tex. Crim. App. 1992)).

Typically, in order for scientific evidence to be considered sufficiently reliable as to be of help to a jury, the evidence must satisfy three criteria: "(1) the underlying scientific theory must be valid; (2) the technique applying the theory must be valid; and (3) the technique must have been properly applied on the occasion in question." *Reynolds v. State*, 204 S.W.3d 386, 390 (Tex. Crim. App. 2006) (citing *Kelly*, 824 S.W.2d at 573). Headspace gas chromatography is considered a reliable method for testing blood alcohol concentration levels and is generally accepted in the scientific community. *See Bekendam v. State*, 398

S.W.3d 358, 363 (Tex. App.—Fort Worth 2013), *aff'd*, 441 S.W.3d 295 (Tex. Crim. App. 2014); *Combs v. State*, 6 S.W.3d 319, 322 (Tex. App.—Houston [14th Dist.] 1999, no pet.) ("Texas and Federal courts have found the gas chromatography test to be a reliable method for identifying compounds, and it has been generally accept[ed] in the scientific community.").

Evidence of a person's alcohol intake as shown by an analysis of a blood sample is admissible when the sample is taken in accordance with statutory requirements. TEX. TRANSP. CODE ANN. § 724.064 (West 2011), § 724.017(a) (West Supp. 2014). "[T]he necessary predicate that the State must prove for admission of such evidence is the use of properly compounded chemicals; the existence of periodic supervision over the machine used; operation by one who understands the scientific theory of the machine; and proof of the result of the test by a witness or witnesses qualified to translate and interpret such results so as to eliminate hearsay." *Garcia v. State*, 112 S.W.3d 839, 848 (Tex. App.—Houston [14th Dist.] 2003, no pet.). The State has the burden of proof to show by clear and convincing evidence that the scientific evidence is reliable. *Hernandez v. State*, 116 S.W.3d 26, 30 (Tex. Crim. App. 2003). We review the trial court's determination of whether these requirements are met under an abuse-of-discretion standard. *Russeau v. State*, 171 S.W.3d 871, 881 (Tex. Crim. App. 2005); *Morales v. State*, 32 S.W.3d 862, 865 (Tex. Crim. App. 2000). We will gauge an abuse of

discretion by whether the trial court acted without reference to any guiding rules or principles. *Hernandez v. State*, 53 S.W.3d 742, 747–48 (Tex. App.—Houston [1st Dist.] 2001, pet. ref'd).

### (b) Analysis

In his first point of error, Jannah contends that the trial court abused its discretion in admitting his blood test result because the State failed to show that the testing protocol was properly conducted. Specifically, Jannah points to three pieces of evidence that he contends rendered the result unreliable: (1) Mayor's testimony that Jannah's blood sample contained blood clots and that blood clots may be caused by the failure to properly invert the vials containing a blood sample, (2) Mayor's admission that she did not homogenize Jannah's blood sample after observing blood clots, and (3) evidence that the pipette used in analyzing Jannah's blood sample failed an external test a month after his blood was tested.

Mayor testified that she analyzed Jannah's blood sample using a technique called head gas chromatography to determine the alcohol concentration in the sample. She used a series of standards and controls to test the accuracy of the procedure and instrument. Mayor explained that to ensure reliability when testing a blood sample's BAC levels, she runs two samples at a time and if the BAC levels of both samples are within five percent of each other, the sample is considered reliable. She also testified that when she tested Jannah's blood on May 15, she ran

10

two samples and determined that the discrepancy between the results of the two tests was less than five percent. This indicated that the result was reliable. We conclude that Mayor's testimony supports the trial court's ruling that the May 15 test result was reliable. *See Reynolds*, 204 S.W.3d at 391 (trial court satisfies gate-keeping function to determine whether technique used in breath test was properly applied "[a]s long as the operator knows the protocol involved in administering the test and can testify that he followed it on the occasion in question . . .").

Jannah contends that the May 15 test result is unreliable because Mayor failed to homogenize his blood sample after observing blood clots and the pipette failed an external test approximately one month later. But Mayor explained that it was unnecessary to homogenize the sample because the blood clots were too small to affect the test. The possibility that blood clots may have affected the results does not render the test result inadmissible where Mayor testified that she followed protocol and the results met the applicable standards. *See Morris v. State*, 214 S.W.3d 159, 172–74 (Tex. App.—Beaumont 2007) (holding that possible problem—inadequate separation of ethanol from the other materials—in blood test sample did not render test result inadmissible where lab's results were validated to plus or minus ten percent variation), *aff'd*, 301 S.W.3d 281 (Tex. Crim. App. 2009). Likewise, Mayor testified that Jannah's controls were within the proper range on May 15 and that the controls would have indicated otherwise if the

11

pipette had not been working properly on May 15. According to Mayor, the standards and controls showed that the pipette operated within the specified tolerances when analyzing Jannah's blood sample. *See id.* at 175–77 (trial court did not err in admitting blood test results because sufficient evidence to rationally conclude test was properly performed where technologist who performed test testified that he followed protocol and control testing showed machine tested within "designed criteria").

Jannah also contends that the blood test result was unreliable because there was evidence that the clots in his blood sample could have resulted from a failure to invert the vials properly. Mayor acknowledged that blood clots can occur when the blood vial is not properly inverted. But Balusek and Officer Swift, who observed Balusek draw Jannah's blood, both testified that Balusek properly inverted the vials. The trial court rationally could have credited Balusek and Swift's testimony that the vial was properly inverted, and we give almost total deference to the trial court's determination of historical facts, especially those based on evaluation of witness credibility or demeanor. *See Gonzales v. State*, 369 S.W.3d 851, 854 (Tex. Crim. App. 2012); *see also State v. Garcia–Cantu*, 253 S.W.3d 236, 241 (Tex. Crim. App. 2008) (when record is silent on reasons for court's ruling, or when there are no explicit fact findings, we imply necessary fact findings that would support court's ruling if evidence, viewed in light most

favorable to ruling, supports those findings). Accordingly, we defer to the trial court's finding that the vials were properly inverted. *See Brooks v. State*, 323 S.W.3d 893, 917 (Tex. Crim. App. 2010) (reviewing court defers to fact finder's resolution of conflicting evidence unless that resolution is not rational in light of burden of proof).

Based on Mayor's testimony, we conclude that the trial court could have reasonably concluded that Mayor analyzed Jannah's blood sample in accordance with proper standards and controls. The trial court also could have reasonably concluded that evidence of blood clots and that Mayor did not homogenize the blood sample did not render the test unreliable. Because Mayor testified that controls were in place to indicate whether any instruments were not working and that she followed protocol in analyzing Jannah's blood, we conclude that the trial court did not abuse its discretion in concluding that the State showed by clear and convincing evidence that Jannah's blood test result was reliable and admissible. *See Stanley v. State*, No. 14-11-00679-CR, 2012 WL 4848762, at *4 (Tex. App.—Houston [14th Dist.] Oct. 9, 2012, no pet.) (mem. op., not designated for publication) (trial court did not abuse its discretion in admitting evidence of blood test where scientist who analyzed appellant's blood testified that she followed protocol in analyzing blood); *Garcia v. State*, 112 S.W.3d 839, 848–49 (Tex. App.—Houston [14th Dist.] 2003, no pet.) (blood test result reliable and properly

admitted where evidence showed nurse followed protocol in extracting and storing blood, toxicologist followed proper lab procedures, and gas chromatograph performed properly and was checked regularly to ensure accurate calibration).

We overrule Jannah's first point of error.

## 2. Search warrant

In his second point of error, Jannah contends that the trial court erred in admitting into evidence the search warrant authorizing his blood draw. The State correctly notes that the affidavit supporting the warrant was *not* admitted into evidence and argues that the warrant itself was admissible because it was not hearsay. We need not decide whether the warrant's admission was error, because error in admitting it, if any, would not warrant reversal.

Error in the admission of evidence is non-constitutional error and is, therefore, subject to a harm analysis under Rule 44.2(b) of the Texas Rules of Appellate Procedure. TEX. R. APP. P. 44.2(b); *Potier v. State*, 68 S.W.3d 657, 666 (Tex. Crim. App. 2002). Non-constitutional error must be disregarded unless it affects the substantial rights of the defendant. TEX. R. APP. P. 44.2(b). Substantial rights are not affected by the erroneous admission of evidence unless the error had a substantial and injurious effect or influence in determining the jury's verdict. *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002). In determining whether the jury's verdict was adversely affected by the error, the appellate court

14

must consider the entire record. *Id.* Additionally, an error in the admission of evidence is harmless where the same evidence comes in elsewhere without objection. *Lane v. State*, 151 S.W.3d 188, 193 (Tex. Crim. App. 2004).

Here, Beaudion testified that a judge issued a warrant authorizing Jannah's blood draw before the blood was drawn. Jannah did not object. When the State later offered the warrant into evidence, to corroborate Beaudion's testimony, Jannah did object. Because Beaudion's testimony that the State obtained a warrant was admitted and the challenged documentary evidence (the warrant itself) are substantively the same, any error in admitting the warrant was harmless. *See Brooks v. State*, 990 S.W.2d 278, 287 (Tex. Crim. App. 1999) (en banc) (improper admission of evidence does not constitute reversible error and is properly deemed harmless if same or similar facts are proved by other properly admitted evidence); *Anderson v. State*, 717 S.W.2d 622, 627 (Tex. Crim. App. 1986) (en banc) (same); *see also Lowery v. State*, No. 05-08-00899-CR, 2010 WL 610915, at \*4 (Tex. App.—Dallas Feb. 23, 2010, pet. ref'd) (not designated for publication) (admission of search warrants was harmless where no supporting affidavits were admitted, officer testified warrants were issued, State introduced warrants to corroborate officer's testimony, and State did not use information in warrants for truth of the matter asserted).

We overrule Jannah's second point of error.

## Conclusion

We affirm the judgment of the trial court.

Rebeca Huddle
Justice

Panel consists of Justices Jennings, Higley, and Huddle.

Do not publish. TEX. R. APP. P. 47.2(b).